1
2
3
4
5
6
7
8
9

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>NAHEED MANGI,<br><br>Defendant. | Case No.   18-cr-00260-EJD-1<br><br>**ORDER DENYING MOTION TO SUPPRESS**<br><br>Re: Dkt. No. 56 |

Defendant Naheed Mangi ("Mangi") moves to suppress evidence—AT&T internet subscriber and location information, three seized computers, documents, and photographs—obtained pursuant to search warrants executed by Stanford University Department of Public Safety ("SUDPS") Detectives.  Def. Naheed Mangi's Mot. to Suppress Evid. Obtained as a Result of Search Warrants Executed by the Stanford Univ. Dep't of Pub. Safety ("Mot."), Dkt. No. 56.  The Government filed an opposition, Dkt. No. 59 ("Opp'n"), and Mangi filed a reply, Dkt. No. 60 ("Reply").  The motion was heard on January 31, 2022 (Dkt. No. 67), after which the parties submitted supplemental briefing (Dkt. Nos. 68, 69).  The Court conducted a further hearing on May 23, 2022.  Having considered the parties' briefs, the record in this case, and the comments of counsel, the Court **DENIES** Mangi's motion to suppress for the reasons stated below.

## I.      BACKGROUND

On August 26, 2013, SUDPS Deputy Sheriffs Scott Floerchinger ("Floerchinger") and Anthony Bejaran met with Stanford University staff in Palo Alto, California.  Hinckley Decl., Ex.

**CASE NO.: 18-CR-00260-EJD-1**
**ORDER DENYING MOTION TO SUPPRESS**

H at MANGI000280, Dkt. No. 56-2.  Pursuant to a Memorandum of Understanding ("MOU")

between the County of Santa Clara and Stanford University, Floerchinger is a "Reserve Deputy

Sheriff" under California Penal Code section 830.6.  *Id*., Ex. A ("MOU") at 2.  The Stanford

University staff told the Reserve Deputy Sheriffs that at 4:30 p.m. on August 19, 2013, the

University fired Mangi from her position as a Clinical Research Coordinator at the University's

Cancer Clinical Trials Office due to a "work performance" issue.  *Id*., Ex. H at MANGI000280.

Stanford University staff said Mangi was "very angry" about her the termination.  *Id*.  Staff told

Floerchinger that at some time on August 19, 2013, Mangi contacted the patient scheduler and

"attempted to cancel several of her sponsored patient appointments, which would possibly have

jeopardized the health and safety of the patients as well as disrupted the research being done by

Stanford." *Id*.  The scheduler was suspicious of the request and consequently did not cancel the

appointments.  *Id*.  According to Floerchinger's Statement of Probable Cause, the clinical research

sponsor, Genentech, told Pei-Jen Chang, the Clinical Research Supervisor for Breast Oncology,

that on August 19, 2013, at 2056 hours Pacific Time, someone using Mangi's account information

accessed and altered a clinical research database.  *Id*.  The alterations included changes to clinical

research results and inappropriate comments about some physicians.  Hinckley Decl., Ex. *Id*.  Staff

informed the Deputies that Mangi "had a personal laptop that she sometimes used for work" and

that her login credentials for the database were "not removed until later on August 20." *Id*. at

MANGI000281.  Stanford staff also told the Deputies that Mangi's login credentials for

Genentech's database weren't removed until sometime on August 20, 2013.  *Id*.

On September 5, 2013, Floerchinger and another Reserve Deputy Sheriff traveled to

Oakland, California (located in Alameda County) and "verified Mangi's residence" in an

apartment on Euclid Avenue.  *Id*.  On September 9, 2013, Stanford School of Medicine's

Associate Chief Information Officer told Floerchinger that "the Internet Protocol (IP) address the

laptop used to connect to the Internet 'geo-located' to somewhere in the Bay Area."  *Id*.  On

September 16, 2013, Floerchinger learned that the database in question was owned by CMED

Clinical Services ("CMED").  *Id*.  Sometime between September 16, 2013, and October 31, 2013,

CASE NO.: 18-CR-00260-EJD-1
ORDER DENYING MOTION TO SUPPRESS

United States District Court
Northern District of California

1   Floerchinger learned that the server on which the database was housed was located in the United

2   Kingdom.  Mot. at 7 (citing Hinckley Decl., Ex. I at MANGI000255).  On September 27, 2013,

3   Floerchinger "obtained the IP address that [Mangi's] account used when it last accessed the

4   database."  Opp'n at 3 (citing Hinckley Decl., Ex. J at MANGI000268).

5       In October and November of 2013, Floerchinger submitted affidavits (which he also

6   amended upon learning new or corrected information) to Santa Clara County judges in support of

7   two search warrants to investigate a violation of California Penal Code §502(c)(4).  Hinckley

8   Decl., Exs. H, J.  One of the warrants was directed to AT&T for subscriber and location

9   information.  Hinckley Decl., Ex. J.  The other was a search warrant for Mangi's Oakland

10  residence.  Id., Ex. H.  In the affidavits, Floerchinger referred to himself as a Detective employed

11  as a "Deputy Sheriff with the [SUDPS]."  Id., Ex. H at MANGI000280, Ex. J at MANGI000266.

12  Floerchinger did not include information in the affidavits regarding the MOU.  Nor did he disclose

13  that the database in question was located in the United Kingdom.

14      Based on the information in Floerchinger's affidavits (and amendments), Santa Clara

15  County Superior Court judges issued the warrants to "ANY PEACE OFFICER IN THE COUNTY

16  OF SANTA CLARA."  Id., Ex. H at MANGI000274, Ex. J at MANGI000262.  On October 18,

17  2013, Judge Shelyna Brown authorized the initial AT&T warrant, which Floerchinger transmitted

18  to AT&T that day.  Id. at MANGI000282.  On October 22, 2013, AT&T rejected the warrant

19  because the incorrect time zone had been listed.  Id.  Floerchinger amended the affidavit, and on

20  November 1, 2013, Judge Brown authorized the amended warrant.  Id.  On November 7, 2013,

21  Floerchinger executed the AT&T warrant, with assistance from AT&T personnel.  Id.  AT&T

22  notified Floerchinger that the IP address used to access and alter the database was the same one

23  registered to Mangi's apartment.  Id.

24      On November 14, 2013, Santa Clara County Judge Rodney Stafford authorized the

25  residential search warrant.  Id., Ex. H.  On November 15, 2013, when Mangi was not home, four

26  SUDPS officers executed the search warrant on her residence, and seized three computers and

27  various documents.  Id., Ex. K at MANGI000189-90.  The SUDPS officers also took photographs

1    during the search.  *Id*., Ex. M at MANGI000287-302.

2         Following the seizure, Floerchinger gave the three computers to a United States Secret

3    Service Agent to "perform [] forensic analysis on the computers."  *Id*., Ex. K at MANGI000193.

4    Secret Service discovered "connection history to the CMED Technology website" on one of the

5    three computers, though "no time or date information was available and no further evidentiary

6    value was found with this computer related to this case."  Ex. Q at MANGI000341.

7         On June 14, 2018, Mangi was charged with two counts of intentionally damaging a

8    protected computer, in violation of 18 U.S.C. §§ 1030(a)(5)(A), (c)(4)(B)(i), (c)(4)(A)(i)(I), and

9    (c)(4)(A)(i)(II), and one count of accessing a protected computer without authorization and

10   obtaining information, in violation of 18 U.S.C. § 1030(a)(2)(C).  Indictment, Dkt. No. 1.

11        Mangi now challenges both warrants and moves to suppress all evidence obtained during

12   the November 15, 2013 search of her Oakland residence, and any fruits thereof.

## II.    DISCUSSION

14        Mangi raises three arguments in support of exclusion.  First, Mangi contends that the Santa

15   Clara County-issued warrants were void *ab initio* because Santa Clara County judges do not have

16   jurisdiction to issue warrants relating to an alleged crime committed outside of Santa Clara

17   County.  Mot. at 11-14.  Second, she asserts that the searches conducted pursuant to the warrants

18   violated her Fourth Amendment rights because they were conducted by Reserve Deputy Sheriffs

19   who had no law enforcement authority beyond the Stanford University Campus.  *Id*. at 14-17.

20   Third, she contends that the Good Faith exception—as set forth in *United States v. Leon*, 468 U.S.

21   897 (1984)—does not apply to searches conducted by deputized private university security

22   officers "who derive their law enforcement authority from" a MOU.  *Id*. at 18-20.  The

23   Government contends otherwise.

### A.    The Validity of the Warrants

25        "Where, as here, a search is conducted by state law enforcement pursuant to a state

26   warrant, and is not otherwise 'federal in character,' the warrant need only conform to the

27   requirements of the Federal Constitution, rather than to the procedural requirements of Rule 41,

28   CASE NO.: 18-CR-00260-EJD-1
     **ORDER DENYING MOTION TO SUPPRESS**

United States District Court
Northern District of California

United States District Court
Northern District of California

1 Fed. R. Crim. P." *United States v. Embry*, 2014 WL 1809388, at *6 (D. Mont. May 7, 2014)

2 (citing *United States v. Bookout*, 810 F.2d 965, 967 (10th Cir. 1987)); *see also United States v.*

3 *Crawford*, 657 F.2d 1041, 1046 (9th Cir. 1981) ("The mere fact that evidence obtained by state

4 officers, under a state warrant, based upon violations of state law, is used in a federal prosecution

5 does not invoke the requirements of Rule 41.  In such cases the standard is whether the warrant

6 comports with the requirements of the Fourth Amendment.") (citations omitted).

7     The Fourth Amendment of the United States Constitution provides that "[t]he right of the

8 people to be secure in their persons, houses, papers, and effects, against unreasonable searches and

9 seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by

10 Oath or affirmation, and particularly describing the place to be searched, and the persons or things

11 to be seized."  U.S. Const. Amend. IV.  Under the Fourth Amendment, "a warrant purportedly

12 authorizing a search beyond the jurisdiction of the issuing magistrate judge is void."  *United States*

13 *v. Henderson*, 906 F.3d 1109, 1117 (9th Cir. 2018).  In California, a state court judge, as a

14 magistrate, has jurisdiction to issue a warrant to be executed in another county "when he has

15 probable cause to believe that the evidence sought relates to a crime committed within his county

16 and thus pertains to a present or future prosecution in that county."  *People v. Fleming*, 29 Cal.3d

17 698, 707 (1981); *People v. Dantzler*, 206 Cal. App. 3d 289, 292 (1988).  Thus, the issue before

18 this Court is whether the state court judges had probable cause to believe that the evidence sought

19 in the two search warrants related to a crime committed in Santa Clara County.  *See id*.

20     The warrants sought evidence of a suspected violation of Penal Code section §502(c)(4)

21 (database alteration).  Penal Code section 502(c)(4) provides that a person is guilty of a public

22 offense when he or she "[k]nowingly accesses and without permission adds, alters, damages,

23 deletes, or destroys any data, computer software, or computer programs which reside or exist

24 internal or external to a computer, computer system, or computer network."  Pen. Code §

25 502(c)(4).  Under California Penal Code section 502(j), "[f]or purposes of bringing a civil or a

26 criminal action under this section, a person who causes, by any means, the access of a computer,

27 computer system, or computer network in one jurisdiction from another jurisdiction is deemed to

28 **CASE NO.: 18-CR-00260-EJD-1**
**ORDER DENYING MOTION TO SUPPRESS**

1  have personally accessed the computer, computer system, or computer network in each

2  jurisdiction." Pen. Code § 502(j).

3      Citing Penal Code section 502(j), Mangi contends that the alleged unlawful access could

4  only have occurred in Alameda County or the United Kingdom, not in Santa Clara County, and

5  therefore the Santa Clara County state court judges lacked jurisdiction to issue the warrants.  The

6  Fourth Amendment, however, requires a magistrate issuing a search warrant to have probable

7  cause, not absolute certainty, that a crime was committed in Santa Clara County.  *Fleming*, 29

8  Cal.3d at 707; *see also People v. Galvan*, 5 Cal. App. 4th 866, 870 (1992) ("[W]hen the magistrate

9  has probable cause to believe that the evidence relates to a crime committed within the county and

10  pertains to a present or future prosecution in that county, he has authority to issue a warrant

11  authorizing a county peace officer to search property located in another county.").  "[P]robable

12  cause means 'fair probability,' not certainty or even a preponderance of the evidence." *United*

13  *States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006) (en banc). A magistrate judge must

14  consider the "totality of the circumstances" and "answer the commonsense, practice question

15  whether there is probable cause."  *Id*. (internal quotations omitted).

16      Floerchinger's affidavits presented sufficient evidence to show a "fair probability" that the

17  alleged section 502 violation was committed in Santa Clara County and thus pertained to a present

18  or future prosecution in that county.  In support of the AT&T warrant, Floerchinger explained that

19  Stanford University's Cancer Institute, located in Santa Clara County, terminated Mangi from her

20  position as Clinical Research Coordinator.  Hinckley Decl., Ex. J at MANGI000266.  Mangi's

21  former job required her to input research data into the Cancer Institute databases.  *Id*.  Upon

22  termination, she was told not to access clinical research databases.  *Id*.  The clinical research

23  sponsor, Genentech, told the Clinical Research Supervisor that someone using Mangi's account

24  accessed and altered one of its clinical research databases on August 20, 2013, at 0256 hours.  *Id*.

25      Floerchinger learned that Mangi occasionally used her personal laptop for work and that

26  Mangi claimed the laptop "had gone missing sometime around the time of her termination."  *Id*. at

27  MANGI000267.  Stanford's Associate CIO for the School of Medicine Information Resources and

28  **CASE NO.: 18-CR-00260-EJD-1**
**ORDER DENYING MOTION TO SUPPRESS**
6

United States District Court
Northern District of California

1   Technology, Todd Ferris ("Ferris"), told Floerchinger that there was a "possibility" Mangi had

2   used her personal laptop to access the Stanford network after her termination.  *Id.*  Ferris also told

3   Floerchinger that "the laptop Mangi received from Stanford" was last seen online by Stanford on

4   August 20, 2013, at about 1424 hours, using IP address 75.37.20.242.  *Id.*  Floerchinger also

5   learned from a CMED employee that on August 20, 2013, Mangi's account used the IP address

6   75.36.178.189 to access the database.  *Id.* at MANGI000268.

7        Based on the "totality of these circumstances" described above—including Mangi's former

8   employment with Stanford, the use of Mangi's account to access the database, Mangi's possible

9   use of the Stanford network and/or use of a Stanford laptop—Judge Brown properly determined

10  that there was probable cause that a crime was committed within Santa Clara County.

11       Judge Stafford also properly found that there was probable cause to search Mangi's

12  apartment in Oakland, California.  Floerchinger's affidavit recited the same facts as in the AT&T

13  warrant.  Hinckley Decl., Ex. H.  His affidavit also indicated that Mangi resided at the Oakland

14  location and included the results of the AT&T search:  the subscriber address and phone number

15  associated with the IP addresses identified in the AT&T warrant matched the address and phone

16  number Stanford University had on file for Mangi.  *Id.* at MANGI000280-83.  Floerchinger also

17  included updated information from CMED indicating that its database was accessed on August 19,

18  2013, at 2056, and not August 20, 2013, at 0256 as was previously reported.  *Id.* at

19  MANGI000282.

20       Defendant relies on *Dantzler* to support her assertion that the Santa Clara County judges

21  lacked jurisdiction to issue the out-of-county warrants; however, that case is distinguishable.  *In*

22  *Dantzler*, the parties stipulated that the search warrant affidavit submitted to a San Francisco

23  municipal court judge for an out-of-county search did not refer to any crime committed in San

24  Francisco, nor did the warrant indicate that the offenses would be prosecuted in San Francisco.

25  206 Cal. App. 3d at 292.  Accordingly, on appeal, the court found it was "undisputed that the

26  search warrant affidavit . . . failed to indicate that the criminal activities with which appellant was

27  charged took place in San Francisco and/or that the criminal prosecution for the charges was to be

28  **CASE NO.: 18-CR-00260-EJD**
    **ORDER DENYING MOTION TO SUPPRESS**

United States District Court
Northern District of California

conducted in San Francisco." *Id*. at 293.  In *Dantzler*, the municipal court judge erred by authorizing an out-of-county search without a showing of the "requisite nexus between the forum and the place to be searched." *Id*.  Unlike in *Dantzler*, Floerchinger's affidavits showed a nexus between Santa Clara County and the two places that were searched.  As discussed above, the affidavits explained that Stanford Cancer Institute, located in Santa Clara County, terminated Mangi from her position as Clinical Research Coordinator.  Mangi's supervisor told Floerchinger that Mangi was very angry about the termination.  The affidavits described how Mangi allegedly used Stanford-issued credentials, the Stanford network, and/or a Stanford-issued laptop to access a database being used for ongoing Stanford clinical research.  Based on these factual allegations, there was a fair probability that Mangi allegedly accessed the CMED database within Santa Clara County.  Thus, the Santa Clara County judges had probable cause to believe the alleged section 502 violation was committed in Santa Clara County and thus pertained to a present or future prosecution in that county.  Therefore, the Santa Clara County judges had jurisdiction to issue the out-of-county warrants.

### B. SUDPS Authority

The MOU provides that "[i]n order to provide for the assignment of certain specific police functions to qualified members of the Stanford University Department of Public Safety . . . , the Sheriff of the County of Santa Clara will deputize Reserve Deputy Sheriffs (under Section 830.6 of the Penal Code) under conditions herewith set forth." MOU at 2.  In turn, section 830.6(a)(1) of the Penal Code provides in pertinent part that "[w]henever any qualified person is deputized or appointed by the proper authority as . . . a reserve deputy sheriff . . . and is assigned specific police functions by that authority, the person is a peace officer." Cal. Penal Code § 830.6(a)(1).  The authority of a person designated as a peace officer pursuant to this paragraph extends only for the duration of the person's specific assignment." *Id*.  Similarly, section 830.6(a)(2) provides that "[w]henever any qualified person is deputized or appointed by the proper authority as . . . a reserve deputy sheriff . . . and is assigned to the prevention and detection of crime and the general enforcement of the laws of this state by that authority, the person is a "peace officer." Cal. Penal

United States District Court
Northern District of California

Code § 830.6(a)(2).  Section II.A. of the MOU sets forth the "Specific Assignments and Jurisdiction of Reserve Deputy Sheriffs."  *Id.* at 3.  Specifically, the MOU states:

> 1.  General law enforcement duties in all areas shown [on an attached map] and described in [another attachment] for the primary purposes of deterring and preventing violations of, and enforcing the laws of, the United States of America, the State of California and the ordinances of the County of Santa Clara.
>
> 2.  The performance of such further duties as from time to time and at such locale as may be assigned by the Sheriff.  The general duties and priorities of the Stanford Reserves are those directed by the Sheriff.

*Id.*  3-4.  The MOU also provides that "[s]ubject to the above Specific Assignments [ ], all initial and follow up investigations of crimes shall be conducted by Stanford Reserves unless the Sheriff directs otherwise."  *Id.* at 4.

Mangi contends that pursuant to the MOU and California Penal Code section 830.6, Stanford Reserve Deputy Sheriffs have no law enforcement authority beyond the Stanford University campus and therefore, their execution of the search warrants violated her Fourth Amendment rights.  The rationale for her argument is that Floerchinger and the other Reserve Deputy Sheriffs were deputized as peace officers under only subsection (a)(1) of California Penal Code section 830.6, which provides peace officer authority "only for the duration of the person's specific assignment"; the MOU limits "specific assignments" to general law enforcement duties on the Stanford campus; and because the alleged violation of Penal Code §502(c)(4) did not occur on the Stanford campus (in Santa Clara County), they lacked authority to execute the out-of-county search warrants.  Mot. at 14-15.

Whether only subsection (a)(1) of Penal Code § 830.6 applies in this case is reasonably debatable because the MOU is vague and ambiguous.  The MOU refers both to "Specific Assignments" as required for deputizing under subsection (a)(1), as well as "[g]eneral law enforcement duties . . . for the primary purposes of deterring and preventing violations of" laws, including California laws, as required for deputizing under subsection (a)(2).  MOU at 3.  However, even if only subsection (a)(1) applies, it does not follow that Floerchinger and the other

**CASE NO.: 18-CR-00260-EJD-1**
**ORDER DENYING MOTION TO SUPPRESS**

9

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Reserve Deputy Sheriffs lacked authority to execute the search warrants at issue.  Although

2    subsection (a)(1) provides that a peace officer's authority "extends only for the duration of the

3    person's specific assignment," this is a temporal limitation, not a geographical or jurisdictional

4    limitation, and thus does not necessarily preclude a Reserve Deputy Sheriff from executing a

5    search warrant outside of Santa Clara County.  Mangi is correct that the MOU limits "specific

6    assignments" to general law enforcement duties on the Stanford campus.  However, as discussed

7    previously, there was probable cause to believe the alleged section 502 violation was committed

8    on the Stanford campus.  Pursuant to section II.D. of the MOU, Reserve Deputy Sheriffs have

9    authority to conduct "all initial and follow up investigations" of that alleged crime.  MOU at 4; *see*

10   *also* Decl. of SUDPS Chief Laura Wilson ("Wilson Decl.") ¶ 3, Dkt. No. 59-1 (stating that

11   pursuant to the MOU, Reserve Deputy Sheriffs investigate most crimes that occur on campus,

12   which includes obtaining and executing search warrants).  Section II.D. of the MOU is consistent

13   with California law, which provides that the authority of a deputized peace officer extends beyond

14   Santa Clara County, "to any place in the state" for "a public offense committed or which there is

15   probable cause to believe has been committed within the political subdivision that employs the

16   peace officer or in which the peace officer serves."  Cal. Penal Code § 830.1.  Indeed, Mangi does

17   not dispute that Reserve Deputy Sheriffs generally have authority to conduct investigations out-of-

18   county so long as the underlying crime was committed at Stanford University.  Reply at 7 n.8.

19   Moreover, even if the MOU did not authorize the Reserve Deputy Sheriffs to execute the warrants

20   at issue, the issuing magistrate did.  *See* Hinckley Decl., Exs. H , K (directing "any peace officer in

21   the County of Santa Clara" to search and seize the listed items).  Therefore, the Court finds that

22   Floerchinger and the other Reserve Deputy Sheriffs had authority to execute the warrants at issue.

23          **C.      Good Faith Exception**

24          As discussed above, the search warrants are valid and the Reserve Deputy Sheriffs had

25   authority to execute them out-of-county.  Assuming *arguendo* that the warrants were not valid,

26   suppression is still not warranted.  In *Leon*, the Supreme Court created a good faith exception to

27   the exclusionary rule for objectively reasonable law enforcement activity.  *Leon*, 468 U.S. at 919.

28   **CASE NO.: 18-CR-00260-EJD-1**
     **ORDER DENYING MOTION TO SUPPRESS**

United States District Court
Northern District of California

1    "[A] warrant issued by a magistrate normally suffices to establish that a law enforcement officer

2    has acted in good faith in conducting the search." *Id*. at 922 (internal quotation marks and citation

3    omitted).  There are exceptions to the good faith exception, including where the affiant misleads

4    the magistrate. *Id*. at 923.  "Suppression . . . remains an appropriate remedy if the magistrate or

5    judge in issuing a warrant was misled by information in an affidavit that the affiant *knew was false*

6    *or would have known was false except for his reckless disregard of the truth*."  *Id*. (emphasis

7    added).

8        First, Mangi contends that Floerchinger's affidavits misled the magistrates because they

9    failed to identify him as a "Santa Clara County Reserve Deputy Sheriff at Stanford" or as a

10   "Stanford Reserve" deputy.  However, there has been no sufficient showing that Floerchinger

11   knowingly or recklessly omitted these facts.  Instead, Floerchinger accurately identified himself in

12   the affidavits as "Detective Scott Floerchinger," employed "as a Deputy Sheriff with the Stanford

13   University Dept. of Public Safety."  Hinckley Decl., Ex. J at MANGI000266; Ex. H at

14   MANGI000280.  SUDPS uses the title "Detective" to refer to deputies assigned to its Investigative

15   Services Division.  Decl. of Scott Floerchinger in Supp. of the United States' Opp'n to Def.'s Mot.

16   to Suppress Search Warrants ("Floerchinger Decl.) ¶ 5, Dkt. No. 59-2; *see also* Wilson Decl. ¶ 3

17   (referring to warrants written by a "SUDPS detective").  He also outlined his qualifications,

18   including his graduation from the "basic police academy at the Santa Clara County Sheriff's

19   Office Justice Training Center" and completion of multiple Peace Officer Standards and Training

20   (POST) certified courses.  *See* Hinckley Decl., Ex. J at MANGI000266; Ex. H at MANGI000280.

21   In short, Floerchinger provided the magistrates with accurate information about his qualifications

22   and role within the SUDPS.

23       Second, Mangi contends that Floerchinger failed to inform the magistrates that pursuant to

24   the MOU, he only had authority to investigate crimes on the Stanford campus.  Again, there has

25   been no sufficient showing that Floerchinger knowingly or recklessly omitted this fact.

26   Furthermore, as discussed above, there was probable cause to believe a crime had been committed

27   on the Stanford campus, and hence Floerchinger had authority to investigate that crime.

28   **CASE NO.: 18-CR-00260-EJD-1**
     **ORDER DENYING MOTION TO SUPPRESS**

United States District Court
Northern District of California

1    Third, Mangi faults Floerchinger for failing to inform the magistrates that the CMED

2  database was located in the United Kingdom and that pursuant to Penal Code section 502(j), the

3  crime occurred outside of Santa Clara County.  But again, there has been no sufficient showing

4  that Floerchinger knowingly or recklessly omitted these facts.  Floerchinger informed the

5  magistrates of all entities involved with the database—who owned the database (CMED), who

6  sponsored the study (Genentech), who used and maintained the database (Stanford), and who was

7  impacted by its alteration (Stanford).  *Id*., Ex. J at MANGI000266-69; Ex. H at MANGI000280-

8  83.  The affidavits also informed the magistrates that Mangi lived in Oakland and hence she could

9  have accessed the database outside of Santa Clara County.  *Id*., Ex. J at MANGI000267, Ex. H at

10  MANGI000283.  Further, the affidavits indicated that AT&T provided the IP addresses out of

11  Fremont and Newark.  *Id.* Ex. Ex. J at MANGI000268, Ex. H at MANGI000282.  As discussed

12  previously, Floerchinger's affidavits set forth sufficient facts to show a "fair probability" that the

13  alleged section 502 violation was committed in Santa Clara County.

14    Therefore, the good faith exception to the exclusionary rule applies, and suppression is not

15  warranted or required.

16  **V.    CONCLUSION**

17    For the reasons stated above, the Court **DENIES** Mangi's Motion to Suppress.

18    **IT IS SO ORDERED.**

19  Dated:  May 31, 2022

20

21

22    EDWARD J. DAVILA
    United States District Judge

23

24

25

26

27

28  **CASE NO.: 18-CR-00260-EJD-1**
    **ORDER DENYING MOTION TO SUPPRESS**
    12